A07A1392, A07A1393. CAPP v. CARLITO'S MEXICAN BAR & GRILL #1, INC.; and vice versa.

(655 SE2d 232)

BERNES, Judge.

Leilani Capp, as guardian and next friend of Brian Hunter Sykes, brought this tort action against Carlito's Mexican Bar & Grill #1, Inc. seeking to recover compensatory and punitive damages under Georgia's Dram Shop Act, OCGA § 51-1-40. Carlito's filed a motion to dismiss the punitive damages claim, which the trial court denied. Following the conduct of discovery, Carlito's filed a motion for summary judgment. The trial court granted Carlito's motion for summary judgment, finding that there was no evidence that any Carlito's employees served alcohol to the patron after she was noticeably intoxicated and that Capp could not recover for Sykes's medical expenses incurred prior to her adoption of the child. In Case No. A07A1392, Capp appeals from the order granting summary judgment. In Case No. A07A1393, Carlito's cross-appeals from the order denying dismissal of the punitive damages claim. For the reasons that follow, the trial court's decisions are affirmed in part and reversed in part.

*Case No. A07A1392*

1. Capp contends that the trial court erred in granting summary judgment to Carlito's as to the Dram Shop claim. "When reviewing the grant or denial of a motion for summary judgment, this Court conducts a de novo review of the law and the evidence, construing that evidence and all reasonable inferences and conclusions therefrom in the light most favorable to the nonmovant." (Footnote omitted.) *Hulsey v. Northside Equities*, 249 Ga. App. 474, 475 (1) (548 SE2d 41) (2001).

So construed, the evidence shows that husband and wife, Gustavo and Jessica Ortiz, managed Carlito's, a restaurant that opened in October 2004. Nathan Bowers, the Ortizes' friend, worked at Carlito's waiting tables and serving drinks. About six weeks after the restaurant opened, Bowers invited Leilani Raker and two juveniles, fifteen-year-old Kerri Ann Lewis and fourteen-year-old Eric Burton, to come

to Carlito's for free meals and drinks. The Ortizes, Bowers, Raker, Lewis, and Burton were neighbors and friends who frequently socialized together.

Raker and the two juveniles accepted Bowers's invitation. At approximately 5:00 p.m., Raker drove with Lewis and Burton to the restaurant. Raker also took her ten-month-old son, Brian Hunter Sykes. Raker parked her truck in the alley behind the restaurant, where Bowers met the group and escorted them through the back entrance.

Throughout the course of the evening, Bowers served Raker, Lewis, and Burton numerous alcoholic beverages. Everyone in the party was drinking heavily. Lewis and Burton both admitted that they drank between four and five margaritas each.[1] Although Bowers claimed that he did not know how many drinks he served Raker,[2] both Lewis and Burton testified that Raker consumed around four or five margaritas and one or two shots of liquor. Bowers conceded "[t]hat's a lot to drink" and "anybody . . . [who] had that much wouldn't be able to make it to the door." Bowers acknowledged that he too had consumed numerous drinks while he was working and that he became intoxicated. In fact, Bowers claimed that by the time they left the restaurant, he was more impaired than Raker.

According to Lewis, as the evening drew late, "you could tell that [Raker] started getting drunk. . . . She started with her loud and obnoxiousness." When the teens were tired and began begging to go home, Raker refused to leave.

The group stayed at Carlito's until the restaurant closed. At about 12:45 a.m., Raker, Sykes, Lewis, Burton, and Bowers left the restaurant together. Although Raker's truck had only one seat, Raker and her four passengers crowded inside and drove away from the parking lot.

On the way home, Raker began driving at high speeds. Raker's passengers warned her to slow down, but Raker continued to speed and eventually lost control of the truck, which rolled over and came to rest in a water-filled ditch. Raker's infant son, Sykes, was ejected from the truck into the ditch. He remained under water until he was rescued and resuscitated by emergency personnel.

Following the accident, Raker and Sykes's biological father voluntarily relinquished their parental rights. Capp, Raker's mother,

---

[1] Carlito's manager, Gustavo Ortiz, was also drinking alcoholic beverages and allowed Bowers to serve the underaged juveniles.

[2] Bowers also claimed at one point that he had only served Raker two margaritas. Bowers denied serving the juveniles any alcoholic beverages, but admitted that he had smoked marijuana with them during the course of the evening.

took custody of Sykes and filed the instant lawsuit against Carlito's seeking recovery on Sykes's behalf under the Georgia Dram Shop Act.

OCGA § 51-1-40 provides that

> [a] person . . . who knowingly sells, furnishes, or serves alcoholic beverages to a person who is in a state of noticeable intoxication, knowing that such person will soon be driving a motor vehicle, may become liable for injury or damage caused by or resulting from the intoxication of such minor or person when the sale, furnishing, or serving is the proximate cause of such injury or damage.

OCGA § 51-1-40 (b). The trial court granted summary judgment in favor of Carlito's, finding that the evidence did not establish that Raker was noticeably intoxicated at the time of last service.[3] The record, however, reveals conflicting evidence on the issue sufficient to create a question of fact for jury determination. Therefore, we must reverse.

At the outset, we note that all of the eyewitnesses to the service and consumption of alcohol by Raker at Carlito's had also been drinking large amounts of alcohol. Their perceptions and memories of the events conflict with each other in many respects and are also internally inconsistent. Bowers admitted that he was the Carlito's employee who served the Raker group that evening, that he had consumed numerous drinks, and that he was more intoxicated than Raker by the time they left Carlito's. According to Bowers, he made no record of the beverages he served the party, and Carlito's claimed that it had no record of the service. While Bowers denied that he had served Raker while she was noticeably intoxicated, he stated that his memory was "foggy" as to some of the events. No information was obtained from Raker about her alcohol consumption because she invoked her privilege against self-incrimination and refused to answer any questions at her deposition.

Nevertheless, there is evidence in the record from which a jury could infer that Bowers served Raker while intoxicated. First, as conceded by Carlito's in its brief, there is evidence in the record that at approximately midnight, Raker engaged in a telephone conversation. Second, there is evidence that shortly after midnight, Raker exhibited signs of intoxication. Specifically, Lewis testified "you could tell that [Raker] started getting drunk. . . . She started with her loud and obnoxiousness . . . [at] about 12:00, 12:15." Third, there is

---

[3] For purposes of summary judgment, Carlito's conceded the issue of knowledge that Raker would soon be driving a motor vehicle.

evidence that after Raker finished the telephone conversation, she was served another drink. Lewis was asked by Carlito's counsel: "When [Raker] was served her last drink[,] as when someone from Carlito's gave her her last drink, was that before or after the phone call?" Significantly, Lewis responded that Raker "had a drink after the phone call." Fourth and finally, there was evidence supporting an inference that Raker had consumed at least all or part of that drink or another drink because later that evening as they were leaving the restaurant, Bowers "topped off" Raker's drink. In this respect, after the accident, Bowers told Jessica Ortiz that he had "topped off" Raker's margarita as they were leaving the restaurant.[4] Indeed, Capp testified that after the accident, Bowers apologized to her on two occasions, stating, "I know [Raker] was drunk, and I shouldn't have let her drive. But I didn't want her to get in trouble, so I didn't tell the police that she was drinking."[5] Based upon this combined evidence, a trier of fact could conclude that Bowers served Raker after midnight when she was noticeably intoxicated and that she consumed the drink prior to leaving.[6]

Accordingly, construed in the light most favorable to Capp, the nonmovant, the evidence presents a genuine issue of fact for jury determination as to whether Bowers, Carlito's employee, knowingly served alcohol to Raker while she was in a state of noticeable intoxication.[7] While there was clearly contrary testimony on this issue, "the credibility of the witnesses where they contradict one another, or themselves" is always a jury question. (Citation and punctuation omitted.) *Harding v. Ga. Gen. Ins. Co.*, 224 Ga. App. 22, 25 (479 SE2d 410) (1996). Summary adjudication was not proper in this case.

---

[4] Bowers's statement to Jessica Ortiz was inconsistent with his deposition testimony that he only served Raker two margaritas – one when she first arrived and then another not long thereafter. It was thus admissible as a prior inconsistent statement. *Conner Ins. Agency v. Strauch*, 198 Ga. App. 536, 537 (3) (402 SE2d 129) (1991). See OCGA § 24-9-83.

[5] Bowers's statement to Capp also constitutes an admissible prior inconsistent statement. OCGA § 24-9-83; *Conner Ins. Agency*, 198 Ga. App. at 537 (3). Bowers had otherwise testified that Raker did not appear to be intoxicated at any point while they were at Carlito's.

[6] That Bowers may not have actually realized that Raker was intoxicated is of no consequence. Under the Georgia Dram Shop Act, a provider of alcohol is deemed to have knowledge if in the exercise of reasonable care, he should have known that the patron was noticeably intoxicated. *Becks v. Pierce*, 282 Ga. App. 229, 233 (1) (638 SE2d 390) (2006). And, in light of Bowers's own intoxication, a jury could determine that he failed to exercise reasonable care in noting Raker's condition while serving her alcoholic beverages.

[7] Carlito's has posited another argument as to causation, which is answered by our conclusion that there was evidence that Raker consumed the drink she was served after being noticeably intoxicated.

2. Capp further claims that the trial court erred in concluding that she was not allowed to recover for Sykes's medical expenses incurred prior to her adoption of the child.

Since it is the parents' legal duty and obligation to provide their child's necessaries, the action to recover medical expenses of a child is vested exclusively in the child's parents. *Rose v. Hamilton Med. Center*, 184 Ga. App. 182, 183 (361 SE2d 1) (1987). When parental duty and control of the child is lost to a third person by any means recognized by law, then the legal duty and obligation to provide for the child devolves upon the third person, who then becomes vested with the right to recover for the child's medical expenses. *Waldrup v. Crane*, 203 Ga. 388, 391 (46 SE2d 919) (1948), overruled on other grounds, *Perkins v. Courson*, 219 Ga. 611 (135 SE2d 388) (1964). But, the question for determination in this case is whether Capp may recover for medical expenses incurred prior to the time that she adopted the child. We must hold that the recovery she seeks is not permitted.

"[T]he rights and obligations of a natural parent, and those of an adopting parent, to a child are not conclusively altered until the date of the final order of adoption." (Citation and punctuation omitted.) *Dept. of Human Resources v. Cowan*, 220 Ga. App. 230, 231 (1) (469 SE2d 384) (1996). It thus follows that the action to recover for a child's medical expenses does not become vested in the adopting parent until after the adoption becomes final. Capp's adoption of Sykes did not become finalized by court order until May 4, 2006. Consequently, she has no right to recover for the child's medical expenses incurred prior to that date.

That a Medicaid Lien may be imposed upon any recovery that Sykes obtains does not alter our result. See OCGA § 49-4-149 (a); *Richards v. Ga. Dept. of Community Health*, 278 Ga. 757, 762 (4) (604 SE2d 815) (2004). Consequently, the trial court's ruling granting summary judgment to Carlito's as to Capp's claim for medical expenses incurred prior to her adoption of Sykes was proper.

### Case No. A07A1393

3. In the cross-appeal, Carlito's contends that the trial court erred in denying its motion to dismiss Capp's claim for punitive damages. We agree.

Punitive damages in tort actions are generally governed by OCGA § 51-12-5.1. Subsection (f) of the statute relates to cases in which a defendant acted or failed to act while under the influence of alcohol. It provides that if "the defendant acted or failed to act while under the influence of alcohol . . . there shall be no limitation regarding the amount which may be awarded as punitive damages

against an *active tort-feasor*." (Emphasis supplied.) This statute makes clear, however, that "such damages shall not be the liability of any defendant other than an active tort-feasor," that is the defendant acting under the influence of alcohol. Id. Thus, punitive damages against a server of alcohol, such as Carlito's, are not authorized. Our interpretation of the statute is supported by the legislature's declared purposes in creating this subsection which were "to provide for removing the limitation on punitive damages for tort cases involving the influence of intoxicating or toxic agents *on* the defendant" and "to eliminate . . . liability [for punitive damages] of third parties as joint tortfeasors." (Emphasis supplied.) Ga. L. 1997, p. 837. Accordingly, we reverse the trial court's decision denying Carlito's motion to dismiss Capp's claim for punitive damages under OCGA § 51-1-40.

In sum, in Case No. A07A1392, we affirm the trial court's decision granting summary judgment in favor of Carlito's as to the issue of medical expenses, but we reverse the trial court's grant of summary judgment to Carlito's as to liability under the Georgia Dram Shop Act, OCGA § 51-1-40, and we remand this case for further proceedings regarding that issue. In Case No. A07A1393, we reverse the trial court's denial of Carlito's motion to dismiss Capp's claim for punitive damages under OCGA § 51-1-40.

*Judgment affirmed in part and reversed in part, and case remanded in Case No. A07A1392. Judgment reversed in Case No. A07A1393. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED NOVEMBER 9, 2007 —
RECONSIDERATION DENIED DECEMBER 6, 2007 — 

*Savage, Turner, Pinson & Karsman, Brent J. Savage, Jeremy S. McKenzie, Kathryn H. Pinckney, Thomas R. Herndon,* for appellant.
*Fields, Howell, Athans & McLaughlin, Paul L. Fields, Jr., Gregory L. Mast, Bradley R. Fellman, Ellis, Painter, Ratterree & Adams, Sarah B. Akins,* for appellee.