******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, C. J., concurring. I write separately to highlight my understanding of part III A of the majority's comprehensive and well reasoned opinion, which I understand to adopt, in a very limited manner, the doctrine of outside reverse piercing of the corporate veil as a matter of Connecticut law for cases filed before July 9, 2019. See footnote 5 of this concurring opinion. The concerns about reverse piercing stated in Justice Zarella's concurring opinion in *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 151, 37 A.3d 724 (2012), originally left me reluctant to join the majority's decision. The majority's narrow approach to reverse piercing, as shown by the distinctions drawn in part III B of its opinion, is, however, responsive to those concerns while preserving that doctrine as an equitable remedy when an individual abuses the "legal fiction" of the corporate form as a "sham or device to accomplish some ulterior purposes"; *Hoffman Wall Paper Co.* v. *Hartford*, 114 Conn. 531, 534–35, 159 A. 346 (1932); such as when a corporate entity does not serve "a legitimate business purpose," and is only "a mere shell . . . used primarily as an intermediary to perpetrate fraud or promote injustice." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 236, 990 A.2d 326 (2010). Accordingly, I join the majority opinion in its entirety.

By way of background, I observe that, in "traditional veil piercing, the veil shields a shareholder who is abusing the corporate fiction to perpetuate a wrong. In outside reverse piercing, however, the corporate form protects the corporation which, through the acts of a dominant shareholder or other corporate insider, uses the legal fiction to perpetuate a fraud or defeat a rightful claim of an outsider. While traditional [piercing] and outside reverse piercing affect diverse corporate interests, the purposes sought to be achieved are similar.

"Both types of piercing strive to achieve an equitable result. . . . In traditional piercing, equity requires [that] the veil be pierced to impose liability on a shareholder who has abused the corporate form for his or her own advantage. . . . Similarly, in outside reverse piercing, an equitable result is achieved by ignoring the corporate fiction to attach liability to the corporation." (Citations omitted.) *In re Phillips*, 139 P.3d 639, 645 (Colo. 2006); see also, e.g., *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 231–33 (describing purpose of piercing corporate veil under Connecticut law).

As Justice Zarella's concurring opinion explained, the fundamental difference between the two doctrines goes beyond "whether an individual has abused the corpo-

rate form" because "[u]nder traditional veil piercing, when an individual is held liable for the actions of the corporation, the corporation itself is not affected by the piercing. In the case of reverse veil piercing, however, the opposite is true. The corporation itself is liable—and thus corporate assets are vulnerable—for the wrongdoing of an individual. In more concrete terms, reverse veil piercing allows courts to alter the legislatively created corporate form by allowing a creditor to reach otherwise protected corporate assets." *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 304 Conn. 155–56.

In expressing his view that the doctrine of outside reverse piercing "should be disavowed" as a matter of Connecticut law, which would require us to overrule the Appellate Court's decision in *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002),[1] Justice Zarella's concurrence identified three major "compelling considerations" that he believed to "militate against allowing reverse veil piercing . . . ." *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 304 Conn. 153. Specifically, Justice Zarella rejected reverse veil piercing on the grounds that it (1) "bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets," (2) "allows a judgment creditor to reach the assets of a corporation to the detriment of other shareholders and existing creditors," and (3) "injects uncertainty into the corporate structure in a way that could systemically alter the ability of corporations to obtain loans and investment capital." (Internal quotation marks omitted.) Id., 155–60. Given these concerns, Justice Zarella would "reject the doctrine of reverse veil piercing until the legislature signals otherwise." Id., 160. I join the majority in the present case because I believe these concerns have been both undermined by subsequent developments in the law, or mitigated by what I understand to be the narrow approach taken in the majority opinion.

Justice Zarella's first concern about reverse veil piercing, which was founded on the decision of the United States Court of Appeals for the Tenth Circuit in *Cascade Energy & Metals Corp.* v. *Banks*, 896 F.2d 1557, 1577 (10th Cir.), cert. denied sub nom. *Weston* v. *Banks*, 498 U.S. 849, 111 S. Ct. 138, 112 L. Ed. 2d 105 (1990), is that the doctrine "bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets." (Internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 304 Conn. 156. In *Cascade Energy & Metals Corp.*, the Tenth Circuit declined to apply reverse veil piercing as a matter of Utah law, stating that "traditional theories of conver-

sion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations [in which] one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the [need] to invent a new theory of liability." *Cascade Energy & Metals Corp.* v. *Banks*, supra, 1577; see also *Floyd* v. *Internal Revenue Service*, 151 F.3d 1295, 1299 (10th Cir. 1998) (following *Cascade Energy & Metals Corp.* and declining to apply reverse piercing as matter of Kansas law, given availability of constructive dividend theory to render benefit to shareholder reachable for tax purposes). As the majority points out, this premise of *Cascade Energy & Metals Corp.* simply is not present in this case, because the sheer number of transactions involved and the movement of money between the multiple corporate entities made it "nearly impossible" as a factual matter to calculate a damages award under a fraudulent conveyance theory, rendering reverse piercing appropriate, and other theories inadequate, in the case at hand.

Moreover, the Tenth Circuit's decision in *Cascade Energy & Metals Corp.* has been substantially undercut by that court's much more recent decision in *United States* v. *Badger*, 818 F.3d 563 (10th Cir. 2016), which also considers reverse piercing under Utah law and is closer to the facts of the present case. In *Badger*, an individual who had agreed to a consent judgment on securities fraud claims used various corporate entities, including a trust and a limited liability company, to hide his assets and avoid collection, and the Securities and Exchange Commission sought to reverse pierce the corporate veil of those entities to hold them liable for the disgorgement portion of the judgment. Id., 565. In agreeing with the commission's arguments, the Tenth Circuit panel deemed itself not bound by the court's previous interpretation of Utah law in *Cascade Energy & Metals Corp.* because *Badger* was distinct both factually and legally. Id., 570–71. With respect to state law, the court first determined that subsequent Utah Supreme Court and intermediate appellate court decisions had "expressed sympathy for reverse piercing, saying that it 'follows logically from the basic premise of the alter ego rule and appears consistent with our case law,' " despite deeming the doctrine inapplicable on the facts of the state court case. Id., 570, quoting *Transamerica Cash Reserve, Inc.* v. *Dixie Power & Water, Inc.*, 789 P.2d 24, 26 (Utah 1990). The court also observed that *Cascade Energy & Metals Corp.* had noted "three features of the case before it that argued against reverse piercing, and these features do not appear to be significantly present" in *Badger*, including (1) "[t]he corporations sought to be held liable had innocent shareholders," (2) the "liability arose out of a voluntary and contractual relationship, which enabled the victims to protect themselves from loss through guarantees or security agreements," and (3) "an essen-

tial feature of all [veil piercing] was absent [as] the plaintiffs had not shown that recognition of the corporate form would sanction a fraud, promote injustice, or produce an inequitable result," stating that "the mere existence of [a corporation's] limited liability would not suffice." (Citations omitted; internal quotation marks omitted.) *United States* v. *Badger*, supra, 569. Accordingly, the Tenth Circuit remanded the case to the district court for further factual development, including consideration of whether "reverse piercing would be inappropriate on the facts of this case," insofar as whether "corporate formalities were observed, that the third-party entities played no part in Badger's wrongdoing, and [whether] innocent shareholders would be impacted if the district court were to apply reverse piercing."[2] Id., 572.

Justice Zarella's concurrence also expressed his concern that "reverse piercing injects uncertainty into the corporate structure in a way that could systemically alter the ability of corporations to obtain loans and investment capital" because the "prospect of losing out to an individual shareholder's creditors will unsettle the expectations of corporate creditors who understand their loans to be secured—expressly or otherwise—by corporate assets. Corporate creditors are likely to insist on being compensated for the increased risk of default posed by outside reverse-piercing claims, which will reduce the effectiveness of the corporate form as a means of raising credit." (Internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 304 Conn. 160, citing *Floyd* v. *Internal Revenue Service*, supra, 151 F.3d 1299. I believe that this concern is overstated, particularly given the narrow version of the doctrine that I understand the majority to adopt, which, consistent with the decisions of the Colorado Supreme Court in *In re Phillips*, supra, 139 P.3d 647, and the Virginia Supreme Court in *C.F. Trust, Inc.* v. *First Flight, L.P.*, 266 Va. 3, 12–13, 580 S.E.2d 806 (2003), requires consideration of the impact of reverse piercing on innocent shareholders, investors, and creditors.[3] With recognition of outside reverse piercing representing the distinct majority view; see, e.g., 1 C. Jones, Fletcher Cyclopedia of the Law of Corporations (2018–2019 Cum. Supp.) § 41.70, pp. 32–34 and n.2; there has been no "exodus of willing lenders" to closely held corporations,[4] despite the wide-ranging risk of reverse piercing faced by unsecured creditors in tax cases given the embrace of that doctrine by the Internal Revenue Service, as well as bankruptcy cases. A. Lvov, "Preserving Limited Liability: Mitigating the Inequities of Reverse Veil Piercing with a Comprehensive Framework," 18 U.C. Davis Bus. L.J. 161, 192 (2017–2018); see also N. Allen, "Reverse Piercing of the Corporate Veil: A Straightforward Path to Justice," 85 St. John's L. Rev. 1147, 1185–86 (2011).

Finally, to the extent that that some authorities have

suggested that we should wait for the legislature to create a reverse piercing remedy because corporate entities are creatures of statute; see *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 304 Conn. 160–61 (*Zarella, J.*, concurring); see also *Acree* v. *McMahan*, 276 Ga. 880, 883, 585 S.E.2d 873 (2003); I observe that this court has, for more than a century, recognized that "the general rule, which recognizes the individuality of corporate entities and the independent character of each in respect to their corporate transactions and the obligations incurred by each in the course of such transactions will be disregarded, where, as here, the interests of justice and righteous dealing so demand." *Connecticut Co.* v. *New York, N. H. & H. R. Co.*, 94 Conn. 13, 26–27, 107 A. 646 (1919). The equitable doctrine of piercing the corporate veil has evolved from this general principle, as it is well established that "[c]ourts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor," in the "exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 139; see, e.g., *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 236; *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 555–57, 447 A.2d 406 (1982); *Zaist* v. *Olson*, 154 Conn. 563, 573–74, 227 A.2d 552 (1967); *Hoffman Wall Paper Co.* v. *Hartford*, supra, 114 Conn. 535. That the legislature has, to this point, taken no action applicable to this case in response to this deeply established body of case law, which exists in concert with our various business entity statutes, suggests to me that we do not overstep our institutional bounds by incrementally extending the doctrine, in its "reverse" form, only to those corporate entities that amount to mere shells in abuse of the privileges extended by our business entity statutes.[5] See *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 327 Conn. 540, 574, 175 A.3d 1 (2018) (*Robinson, J.*, concurring) (recognizing common-law cause of action for breach of patient confidentiality because it complemented federal and state confidentiality statutes); see also *Sky Cable, LLC* v. *DIRECTV, Inc.*, 886 F.3d 375, 389 (4th Cir. 2018) (concluding that Delaware law would recognize outside reverse piercing of corporate veil with respect to limited liability company that is "sham entity" as "alter ego of its sole member" given "Delaware courts' traditional power . . . to look through these legal fictions" and because not recognizing doctrine "would limit Delaware's ability to [prevent] the entities that it charters from being used as vehicles

for fraud, and would allow solvent debtors to engage in fraud by using [limited liability companies] solely to avoid liability for their debts" [internal quotation marks omitted]).

In adopting the doctrine of reverse veil piercing as a matter of Connecticut law, the majority utilizes a "three part process" to govern the inquiry, under which the outsider must first prove that, "under the instrumentality and/or identity rules, as set forth in traditional veil piercing cases, the corporate entity has been so controlled and dominated that justice requires liability to be imposed . . . ." (Internal quotation marks omitted.) See also, e.g., *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 232–33 (identifying factors to consider under instrumentality and identity rules). If the outsider prevails on the first part of the inquiry, the trial court must also consider "the impact of reverse piercing on innocent shareholders and creditors" and "whether adequate remedies at law are available" in deciding whether to reverse pierce the corporate veil. In part III B of its opinion, the majority upholds the trial court's application of the reverse piercing doctrine to those entities only when it did not harm innocent parties, such as nonculpable employees and investors, and the movement of assets between entities made it nearly impossible for the plaintiff, Robert J. McKay, to attach those assets in satisfaction of the debts owed.[6] I emphasize that my agreement with part III of the majority opinion is dependent on that distinction, and I would not permit the doctrine to be employed absent extreme abuse of the corporate form, or in cases where its application would injure a corporation's innocent shareholders or employees.[7] I accept that these equitable limitations render outside reverse veil piercing "unlikely to impact many business entities other than a limited number of closely held corporations with few shareholders or only a single shareholder." *In re Phillips*, supra, 139 P.3d 647. Nevertheless, the reverse piercing doctrine retains value as a matter of law in circumstances such as the present case, where traditional collection procedures have been frustrated by corporate forms that are nothing more than shells utilized to perpetrate injustice by hiding assets in evasion of the New York judgment.

Accordingly, I join the majority opinion, insofar as I read part III of that opinion to adopt a very limited approach to the doctrine of reverse piercing of the corporate veil for cases filed before July 9, 2019.

[1] The majority comprehensively discusses *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 133, in footnote 28 of its opinion.

[2] Subsequent developments have likewise undercut the decision of the California Court of Appeals in *Postal Instant Press, Inc.* v. *Kaswa Corp.*, 162 Cal. App. 4th 1510, 1513, 77 Cal. Rptr. 3d 96 (2008), review denied, California Supreme Court, Docket No. S164823 (August 27, 2008), which has been relied upon for the proposition that California rejects the doctrine of reverse veil piercing. See, e.g., 1 J. Cox & T. Hazen, The Law of Corporations (3d Ed. 2010) § 7:18, p. 443 n.20; N. Allen, "Reverse Piercing of the Corporate Veil: A Straightforward Path to Justice," 85 St. John's L. Rev.

1147, 1148 n.12 (2011). In *Postal Instant Press, Inc.*, the California Court of Appeals heavily relied upon the Tenth Circuit's analysis in *Cascade Energy & Metals Corp.* v. *Banks*, supra, 896 F.2d 1576–77, and observed the following: "Outside reverse piercing can harm innocent shareholders and corporate creditors, and allow judgment creditors to bypass normal judgment collection procedures. Legal theories (such as agency or respondeat superior) and legal remedies (such as claims for conversion or fraudulent conveyance) adequately protect judgment creditors without the need to distort theories of corporate liability." *Postal Instant Press, Inc.* v. *Kaswa Corp.*, supra, 1513.

California courts have since revisited the reverse piercing issue, at least in part, in a more recent decision, *Curci Investments, LLC* v. *Baldwin*, 14 Cal. App. 5th 214, 221 Cal. Rptr. 3d 847 (2017), which suggests that the doctrine is appropriate under the limited circumstances embraced by the majority in the present case. In that case, the court distinguished *Postal Instant Press, Inc.*, describing it as "expressly limited" to corporations, rather than limited liability companies, and also distinguishable because the judgment debtor in the case before it held "a 99 percent interest in [the limited liability company]. His wife holds the remaining 1 percent interest, but she is also liable for the debt owed . . . . There simply is no 'innocent' member of [the limited liability company] that could be affected by reverse piercing here." Id., 222. The court also emphasized the relative lack of judgment collection options available in the context of a limited liability company, because "a creditor does not have the same options against a member of [a limited liability company] as it has against a shareholder of a corporation," given the need to obtain a charging order against distributions to the member—who remains in control of the entity—rather than "step straight into the shoes of the debtor." Id., 223. The court emphasized that it was "unconcerned about reverse veil piercing being used when legal remedies are available. Although legal remedies—e.g., conversion, fraudulent transfer—may be available in many cases, thereby precluding reverse veil piercing, it is precisely the rare situations in which they are not that reverse piercing should deliver justice. Plus, requiring a creditor wishing to invoke the doctrine to demonstrate the absence of a plain, speedy, and adequate remedy at law would protect against reverse piercing being used to bypass legal remedies." Id. In remanding the case for further factual findings, the court emphasized that the "case before us presents a situation where reverse veil piercing might well be appropriate. [The judgment creditor] has been attempting to collect on a judgment for nearly half a decade, frustrated by [the judgment debtor] nonresponsiveness and claimed lack of knowledge concerning his own personal assets and the web of business entities in which he has an interest. Although the formation of [the limited liability company] predates the underlying judgment, its purpose has always remained the same—to serve as a vehicle for holding and investing [the judgment debtor's] money." Id., 224. The court further noted the judgment debtor's "possession of near complete interest in [the limited liability company], and his roles as [chief executive officer] and managing member, [the judgment debtor] effectively has complete control over what [the limited liability company] does and does not do, including whether it makes any disbursements to its members . . . . Since the time judgment was entered in [the judgment creditor's] favor, [the judgment debtor] has used that power to extend the payback date on loans made to ultimately benefit his grandchildren (loans on which not a single cent has been repaid), and to cease making distributions to . . . himself and his wife, despite having made $178 million in such distributions in the six years leading up to the judgment." Id.

I find similarly unpersuasive the Georgia Supreme Court's decision in *Acree* v. *McMahan*, 276 Ga. 880, 882–83, 585 S.E.2d 873 (2003), upon which Justice Zarella also relied in his concurring opinion in *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, supra, 304 Conn. 160–61. Like *Postal Instant Press, Inc.*, the decision in *Acree* relied heavily on the Tenth Circuit's decision in *Cascade Energy & Metals Corp.*, which I believe has been undercut by the subsequent decision in *United States* v. *Badger*, supra, 818 F.3d 563, at least with respect to the narrow application employed by the majority in the present case. See also *Mathias* v. *Rosser*, Ohio Court of Appeals, Docket No. 01AP-768 (CRP), 2002 WL 1066937, *6 (May 30, 2002) (relying on *Cascade Energy & Metals Corp.* and summarily rejecting reverse piercing doctrine under Ohio law).

[3] I note that Virginia also requires "a litigant who seeks reverse veil piercing [to] prove the necessary standards by clear and convincing evidence." *C.F. Trust, Inc.* v. *First Flight L.P.*, supra, 266 Va. 13. Because this issue has

not been raised by the parties, I need not consider further whether Connecticut law imposes a higher standard of proof in veil piercing cases.

[4] As the Colorado Supreme Court has noted, these equitable limitations, including those embraced by the majority in this case, render outsider reverse veil piercing "unlikely to impact many business entities other than a limited number of closely held corporations with few shareholders or only a single shareholder." *In re Phillips*, supra, 139 P.3d 647.

[5] As the majority recognizes in footnote 27 of its opinion, on June 25, 2019, while this appeal was pending after oral argument, the legislature passed No. 19-181 of the 2019 Public Acts (P.A. 19-181), which codifies the instrumentality test for veil piercing and expressly prohibits the use of the reverse veil piercing doctrine or remedy. That legislation was later signed by the governor on July 9, 2019. I agree with the majority's conclusion that P.A. 19-181 does not affect this appeal, given that the legislature has plainly and unambiguously provided that P.A. 19-181, § 3, is "effective from passage and applicable to any civil action filed *on or after the effective date of this section*." (Emphasis added.) See *Spector Motor Service, Inc.* v. *Walsh*, 135 Conn. 37, 43, 61 A.2d 89 (1948) (effective upon passage means date of governor's signature); *Old Saybrook* v. *Public Utilities Commission*, 100 Conn. 322, 325, 124 A. 33 (1924) (same). Given this plain and unambiguous language with respect to the effect on pending litigation, I conclude that the legislature did not "clearly and unequivocally" express the intent necessary for us to retroactively apply P.A. 19-181 in light of the presumption of prospective application under General Statutes § 55-3, because this change to the remedial scheme would effectively "[bring] about changes to the substantive rights" of the plaintiff. (Internal quotation marks omitted.) *In re Daniel H.*, 237 Conn. 364, 372–73, 678 A.2d 462 (1996); see also, e.g., *D'Eramo* v. *Smith*, 273 Conn. 610, 620, 872 A.2d 408 (2005); *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 693–94, 755 A.2d 850 (2000).

[6] Specifically, in part III B 1 of its opinion, the majority concludes that the trial court properly reverse pierced the corporate veil of several corporate defendants, namely, Sapphire Development, LLC, Lurie Investments, LLC, R.I.P.P. Corp., and 2 Great Pasture Road Associates, LLC, while part III B 2 of the majority's opinion affirms the judgment of the trial court declining to disturb the corporate veil of defendants Solaire Development, LLC, Solaire Management, LLC, Solaire Funding, Inc., and W.W. Land Company, LLC.

[7] Accordingly, I would overrule the Appellate Court's decision in *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 133, to the extent that it adopted a version of outside reverse veil piercing that mirrors traditional veil piercing, and does not incorporate the additional two factors identified by the majority. See id., 151 ("[w]e . . . recognize that under the appropriate circumstances, i.e., when the elements of the identity or instrumentality rule have been established, a reverse pierce is a viable remedy that a court may employ when necessary to achieve an equitable result and when unfair prejudice will not result"); but see id., 151 n.14 (noting criticisms of doctrine, namely bypass of normal judgment collection procedures and unfair prejudice to innocent shareholders, but stating that they were "not implicated" by facts of case).

———————————————